IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY R. RICHARDS,          )
                                )
       Plaintiff,            )
                                )
vs.                             )     Case No. 12-cv-01195-JPG-DGW
                                )
U.S. STEEL,               )
                                )
       Defendant.        )

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant U.S. Steel's Motion (Doc. 33) for Summary Judgment.  Plaintiff filed a Response (Doc. 37) and the Defendant filed a Reply (Doc. 40).  Local Rule 7.1(c) states that reply briefs are not favored and should be filed only in exceptional circumstance.  Defendant states such circumstances and the Court will consider the reply brief.  Also before the Court is Defendant's Objection To and Motion to Strike Evidence and Statements of Facy (sic) Submitted by Plaintiff in Support of her Response to U.S. Steel's Motion for Summary Judgment (Doc. 39).

### 1.  Background

This is a Civil Rights Employment Complaint based on the following:

**August 16, 2010**:  Ms. Richards filed an EEOC Complaint alleging failure to promote and receive a pay raise due to being the only female in the Electrical Learner Program.  Ms. Richards also alleged that she was suspended on July 14, 2010, after being accused of calling the staff at the health clinic "nuts" and "crazy."  She also states that she filed a complaint of discrimination against the company about one and a half years ago and believed she was being retaliated against.  The Complaint further alleges that her area manager, Dan Harris, stated she

1

was not promoted because she had not worked with tools enough.  The complaint period is 6-3-2010 to 07-14-2010, but the complaint also states that in January 2010, Mr. Harris told Ms. Richards she would never meet his standards as an electrician.  There is a handwritten note on the EEOC Complaint, "Lowry McBride – area manager Jesse Byrd – supervision – both have now retaliated with suspension."  (Doc. 37-4, pg 3).

**September 3, 2010:**  Ms. Richards filed a Union Civil & Human Rights Complaint alleging inappropriate, unwelcomed, and offensive touching by area manager Lowery McBride in that he pulled a microphone off of Ms. Richards' right chest without permission.  Mr. McBride also blocked doorway preventing Ms. Richards from exiting room.  (Doc. 37-4, pg1).

**Early 2011:**  Harassment from Lydia Kachigian, U.S. Steel Human Resources, informing Ms. Richards, "Just because you don't like Jesse's rough management style doesn't mean we have to do anything, and you need to adjust to your environment."  Also, Human Resources failed to take action on her complaints.

**January 28, 2011:**  Ms. Richards filed a Union Civil & Human Rights Complaint alleging inappropriate sexual jokes while in break room with co-workers present by supervisor Jesse Byrd. The complaint further alleges unnecessary, unreasonable comments while performing her job at the BOF electrical shop; innuendos about weight in front of co-workers; and demeaning remarks when she asked for information about the work she had completed.

Ms. Richards worked for Jesse Byrd in the BOF from April 2010 until January 9th, 2011. During this period Ms. Richard states the following incidents occurred:

1)    Mr. Byrd, "randomly gave out tools …. and did not give me the same tools." (Doc. 37-7, page 20).

2)    Mr. Byrd "got snippy" and only gave Ms. Richards one stick ruler when she requested two.  (Doc. 37-7, page 24).

2

3)     Mr. Byrd provided LED lights to "everybody" at Christmas, but failed to provide one to Ms. Richards when she returned to work in February.  (Doc. 37-7, page 26).

4)     The first day Ms. Richards worked for Mr. Byrd he inquired whether she could, "draw a motor circuit."  Ms. Richards responded that they were taught in school and Mr. Byrd asked if she could draw one without mistakes.  Ms. Richards did not respond to that question.  "I was irritated by him doing that to me."  Mr. Byrd then asked what Ms. Richards learned in blueprint class and she asked for a specific question and he stated, "No, I need to know what you know" to which Ms. Richard, "I just looked at him."  Mr. Byrd only asked these questions of Ms. Richards.  (Doc. 37-7, page 37-38).

5)     Ms. Richards stepped on a bucket to reach some screws and Mr. Byrd asked, "You think that bucket will hold all that?"  Ms. Richards acknowledges that there were safety procedures and that, "I probably should not have stood on the bucket" but "That doesn't change what he said."  (Doc. 37-7, page 44).  Ms. Richards states that comment was about her weight.  (Doc. 37-7, page 45).  "That is not talking about anything else but how big I am."  (Doc. 37-7, page 80).

6)     Ms. Richards lost a glove and asked Mr. Byrd for a pair of gloves.  He responded, "Well, do you want one glove or two?" Ms. Richards stated, "If you're going to give me one glove, make sure it's the right hand, or you can give me a pair, whatever works for you," and then Mr. Byrd made a remark about people being incompetent.  Mr. Byrd then gave Ms. Richards a pair of gloves that were too big, because he stated he did have any size small. (Doc. 37-7, page 46).

7)     Ms. Richards came to work and a co-worker informed her that, "Jesse is going to jump you about not putting that stuff away."  Mr. Byrd did "jump" her about it and she responded that, "I did exactly what you said, put the box in that room.  I can't read your mind, you have to tell me."  (Doc. 37-7, page 49)

8)     Mr. Byrd informed Ms. Richards that she would probably be fired and that there was no way he was going to save her over an unspecified incident in which she and Jerry Schneider were attempting to fix, "the incident and I don't know exactly what went wrong" but Ms. Richards attempted to reach Mr. Byrd and then had another employee, Dan Guy, in to assist.  During this incident, Mr. Byrd asked Ms. Richards, "Are you listening to me?" and Ms. Richards responded, "Are you talking to me?"  When Mr. Byrd stated he was speaking to her, Ms. Richards responded, "Jesse, I can hear everything you say, but I'm not going to turn around again because the last time I turned around, you told me I was scared of you, so I can listen sitting sideways."  (Doc. 37-7, pages 66-67).

9)     On New Year's Eve, 2011, Mr. Byrd refused Ms. Richards overtime stating, "Before I let you work the overtime, I'll jump off the bridge," and Ms. Richards responded that "I'll take you to the bridge." (Doc. 37-7, page 69.) Ms. Richards was allowed to work the overtime by Dan Guy. (Doc. 37-7, page 70-71)

10)    Ms. Richards' partner overheated and Mr. Byrd, "starts screaming to me to get down the ladder." Ms. Richards responds, "I will. Let me make sure my partner is able to get down the ladder" and Mr. Byrd states, "Just get down." (Doc. 37-7, page 86). Then later, in the break room, Mr. Byrd, "went bizerk" when Ms. Richard requested to go back up for her tools and required her to sit down for 15 or 20 minutes. While sitting there, a guy sitting across from Ms. Richards asked to get her a Gatorade and Ms. Richards responded, "My boss won't buy Gatorade" just as Mr. Byrd was walking in and overheard. Ms. Richards states that, "Jesse is towering over me walking toward me telling me to tell him my boss was a prick." Ms. Richards responded, "I don't have to, you already did." Ms. Richards states that Mr. Byrd became angry and was "pacing back and forth like a mad dog" and got behind her and that "He does that kind of stuff to make you do something stupid so he can fire you." (Doc. 37-7, pages 86-90).

11)    While in the break room with several co-workers, Mr. Byrd told a joke that he had asked his wife why her ass was getting so big, and his wife came back with a remark that they need to put Miracle-Gro on his dick to make it grow. The joke was not told directly to Ms. Richards and when she attempted to leave, Mitch Lemons was standing in the doorway, "So, it was useless for me to get and leave because there was someone blocking the door." (Doc. 37-7, pages 92-93

**February 12, 2011**: Ms. Richards called Sexual Harassment Hotline to report incident on June 14, 2010, of Jesse Byrd grabbing her jacket, pulling it open, and stating, "I like that.". In her deposition, she states that she assumed he was referring to her chest and "I was shocked, I was scared, and I just got the hell away from him." (Doc. 37-7, page 39). However, Ms. Richards' personal notes state that, "He was referring to my addition of some pockets for my tools." (Doc. 33-7).

**September 29, 2011**: Ms. Richards' unexcused absence and improper report off.   (Doc. 37-6).

**October 2, 2011**: Ms. Richards receives Notification of Discipline which states 5 Day Suspension Subject to Discharge. (Doc. 33-3)

**October 7, 2011**:  Notice sent to Ms. Richards that her 5 Day Suspension had been converted to a discharge effective October 2, 2011.  (Doc. 33-3).

**February 17, 2012**:  Ms. Richards had continued to work under Union grievances procedures and was informed on this date that the discharge was being upheld and that the union would be taking it to arbitration.  (Doc. 33-3)

**Summer of 2014**:  Arbitration awarded Ms. Richards a 30-day suspension and retention as employee at U.S. Steel.  (Doc. 33-3).

Based on the above, Ms. Richards is claiming one count of retaliation for having initiated an internal sexual harassment claim in January 2011 and for not calling off work on September 29, 2011; one count of intentional infliction of emotional distress in that the defendant's action were willful and intentional in a series of actions seeking to discharge Plaintiff in write-ups and ignoring her complaints of harassment which resulted in tremendous emotional distress; and one count of sexual harassment in that it created a hostile work atmosphere.     (Complaint, Doc. 2).

**2. Analysis**

The Court must first address Defendant's Objection To and Motion to Strike Evidence and Statements of Facy (sic) Submitted by Plaintiff in Support of her Response to U.S. Steel's Motion for Summary Judgment (Doc. 39).  Plaintiff did not file a response to the Motion to Strike and thus failed to provide the Court any information pertaining to the admissibility of the evidence requested to be stricken.  Although some of the evidence may become admissible at trial, the Court can not speculate on the manner in which a party intends to admit evidence.  The Court can only rule on the evidence as it currently stands before it on summary judgment.

For the purpose of summary judgment, evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Haywood v. Lucent Technologies, Inc*., 323 F.3d 524 (7th Cir. 2003).

The Defendant first moves to strike the Psychological Assessment Report of Dr. Jeremy Jewell (Doc. 37-5) and all attachments thereto, all statements of fact support by said report, and all other statement otherwise referencing the opinions or report of Dr. Jewell because the report is not accompanied by a supporting affidavit verifying its authenticity.

In support, Defendant cite *Scott v. Edinburg,* 346 F.3d 7522, 759 (7th Cir. 2003) which held that a, " . . . report was introduced into the record without any supporting affidavit verifying its authenticity and is therefore inadmissible and cannot be considered for purposes of summary judgment." However, Federal Rule of Civil Procedure 56(c) (as of the 2010 Amendments) no longer requires a formal affidavit. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit. Even so, Dr. Jewell's Report does not contain a written unsworn declaration, certificate, verification, or statement subscribed in proper form. The report only contains the signature of Dr. Jewell and thus fails as a type of evidence admissible at trial.

Therefore, the Psychological Assessment Report of Dr. Jeremy Jewell (Doc. 37-5), all attachments thereto, all statements of fact support by said report, and all other statement otherwise referencing the opinions or report of Dr. Jewell are stricken for the purpose of Plaintiff's Response to Defendant's Motion for Summary Judgment. However, Plaintiff's testimony with regard to her evaluation by Dr. Jewell is based upon her personal knowledge and such testimony remains.

Next, Defendant moves to strike the U.S. Department of Labor letter dated May 17, 2013 (Doc. 37-1), all statements of fact supported by the letter, and all other statements otherwise referencing said letter or any investigation or finding by the U.S. Department of Labor or Occupational Safety and Health Administration as irrelevant to the claims in this matter.  The inspection referenced in the letter was conducted after the relevant time periods of Plaintiff's Complaint and Defendant argues that as such, it is irrelevant and inadmissible.

The Court agrees.  The letter does not make any fact of consequence more or less probable and it has no reference to plaintiff's claims.  Fed.R.Evid. 401.  Therefore, this portion of the Defendant's Motion to Strike is granted and the U.S. Department of Labor letter dated May 17, 2013 (Doc. 37-1), all statements of fact supported by the letter, and all other statements otherwise referencing said letter or any investigation or finding by the U.S. Department of Labor or Occupational Safety and Health Administration are stricken.

The Defendant next moves to strike portions of the Plaintiff's Affidavit (Doc. 37-6). The law is well-established that "in general, parties may not 'patch-up potentially damaging deposition testimony' with a contradictory affidavit."  *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001)(citing *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999)).  "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."  *Russell v. Acme Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 919 n. 4 (7th Cir. 2001).  This rule applies, however, only where the discrepancies are transparent shams, not where they are simply clarifications of earlier ambiguous or confusing statements where they

merely go to the credibility of the witness. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169-72 (7th Cir. 1996). Furthermore, the Court will consider a contradictory affidavit if the declarant satisfactorily explains the discrepancy in the testimony. *Commercial Underwriters*, 259 F.3d at 799.

The Defendant requests the following be stricken from Plaintiff's Affidavit:

1. "The company announced my discharge, but under a contractual provision negotiated by the company and my union and agreed to by both I continued to work until the grievance could be resolved." (Doc. 37-6, paragraph 2).

Defendant objects and moves to strike this statement as misleading. However, this statement does not appear to the Court to be misleading or a sham, but simply the understanding of the Plaintiff of the manner in which she was permitted to continue her employment. This portion of the Motion to Strike is denied.

2. Paragraph 2 of the Affidavit of Mary Richard's in its entirety.

Defendant objects and moves to strike this paragraph arguing that the subject matter is irrelevant and inadmissible. Paragraph 2 contains statements that pertain to when Plaintiff realized that her grievance arising from her discharge was not being resolved in her favor. These statements do not appear to the Court to contradict her deposition testimony and the testimony regarding the grievance is relevant at this point in the litigation when the Court is required to take all facts in the light most favorable to the nonmoving party. This portion of the Motion to Strike is denied.

3. The statement that the Arbitration ruled in favor of the Plaintiff. (Doc. 37-6, para. 3).

Defendant objects and moves to strike this statement as inadmissible hearsay. The Defendant argues that the Plaintiff is offering the purported ruling for the purpose of proving that her grievance was resolved in her favor, when it was not, and that Plaintiff should have provided

a copy of the Arbitration Award with her Affidavit.  Defendant further argues that such statement should be stricken because the Plaintiff has not demonstrated that any part of the arbitrator's ruling was based on a finding that Defendant's decision was motivated in any way by a discriminatory or retaliatory animus.

The Court believes that this is not a statement of fact, but a statement of the Plaintiff's opinion.  Since she was allowed to remain in her employment, her view of the arbitrator's decision was that it was "favorable" for her.  Plaintiff's statement also went on to include that she received a 30-day suspension, so it does not appear that the statement was an attempt to mislead the Court.  However, the Court agrees that the arbitration decision is potentially relevant and not the Plaintiff's view of whether the decision was favorable.  Fed.R.Evid. 401.  As such, that portion of line 2, paragraph 3, Affidavit of Mary Richard (Doc. 37-6), stating, "ruled in my favor and" is stricken as irrelevant.

4.      Plaintiff's testimony and all statements of fact that "Dan Bunker was not terminated even though he called off just before his shift" as well as, any other statements alleging that Dan Bunker was treated more favorable than Plaintiff.

Defendant objects and moves to strike this testimony and all statements of fact, because it is irrelevant and inadmissible hearsay.  A review of the Plaintiff's testimony does not indicate whether she had personal knowledge of the circumstances surrounding the incident when Dan Bunker "called off" his shift and Dan Bunker was not deposed.  As such, this testimony is hearsay that does not fall under the exceptions to the hearsay rule.  As such, Plaintiff's testimony and all statements of fact that "Dan Bunker was not terminated even though he called off just before his shift" as well as, any other statements alleging that Dan Bunker was treated more favorable than Plaintiff is stricken.  Fed.R.Evid. 801.

5.      Plaintiff's testimony and all statement of fact referencing an incident in which a person by the name of "Tonya" saw Jesse Byrd rubbing an Oreo Cookie on his "private parts."

Defendant objects and moves to strike this testimony and all statements of fact, because it is irrelevant, inadmissible hearsay, and inadmissible character evidence.  The Court agrees this testimony is hearsay and does not fall under any of the exceptions to the hearsay rule. Fed.R.Evid. 801.  As such, Plaintiff's testimony and all statement of fact referencing an incident in which a person by the name of "Tonya" saw Jesse Byrd rubbing an Oreo Cookie on his "private parts" is stricken.

6.      Plaintiff's testimony and all statement of fact that Ed Dintleman did not have any disciplinary issues with Plaintiff other than her failure to call off on September 29, 2011.

Defendant objects and moves to strike this testimony and all statements of fact, because it misrepresents the uncontroverted evidence regarding Plaintiff's discipline history and contradicts Plaintiff's own admissions.  The Court notes that Mr. Dentleman is spelled with an "i" on some documents and with an "e" on others.  The Court will go with the "e" as indicated on his deposition transcript.

During the deposition of Ed Dentleman, he was asked, "Okay.  Have you had any disciplinary problems with her?" to which he responded, "Just when she didn't call off work, that's the only time we've ever had."  (Doc. 37-12, pg 8).  Although Defendant argues that Plaintiff's disciplinary record and own admissions contradict this statement, it is clear that the statement is the actual testimony of Mr. Dentleman.  The Court further notes that this statement pertains solely to Mr. Dentleman and is not referring to Plaintiff's employment history as a whole.  As such, Plaintiff's statement is supported by the record and this portion of the Motion to Strike is denied.

7.      All testimony and statements of fact regarding Defendant's purported failure to provided Plaintiff a bathroom, as well as, all testimony and statement of fact regarding the actions of Lowery McBride.

Defendant objects and moves to strike this testimony and all statements of fact, because it is irrelevant and inadmissible.   The Plaintiff's Complaint, Count I in part, alleges that Defendant retaliated against Plaintiff for having initiated an internal sexual harassment claim in January 2011.   However, Count II alleges, in part, that Defendant's action were willful and intentional because Defendant knew the Plaintiff to have complained of prior sexual harassment.   As such, testimony and statements of fact regarding Defendant's purported failure to provided Plaintiff a bathroom, as well as, all testimony and statement of fact regarding the actions of Lowery McBride may have a tendency to make the prior sexual harassment more probably then it would be without the evidence.   As such, this portion of the Motion to Strike is denied.

8.      All references to Defendant's harassment hotline as being "new" or "newly initiated."

Defendant objects and moves to strike this testimony and all statements of fact, because it is a conclusory allegation that lacks evidentiary support and is contradicted by Plaintiff's own testimony.   A review of the testimony gives no indication of when the Plaintiff actually knew Defendant's harassment hotline was initiated.   Plaintiff's testimony was, "As far as I know of, this hotline number just got established."   (Doc. 37-7, pg 52)   Although the Court acknowledges that the hotline number was included in the Defendant's Sexual Harassment Policy (Doc. 33-3), which the Plaintiff admits she receives, there is no indication that Plaintiff fully read the policy and took notice of the Hotline number.   However, Plaintiff does testify that she received the Defendant's Sexual Harassment Policy (Doc. 37-7, pgs 40-41).   As such, this portion of the Motion to Strike is granted to the extent that the portion of Plaintiff's Response (Doc. 37, pg 3)

stating, "The number was not in the sexual harassment policy she received" is stricken and the remainder of this portion of the Motion to Strike is denied.

9.      All testimony and statements of fact alleging that Jesse Byrd jerked Plaintiff's jacket open, looked at her breasts, and stated, "I like that."

Defendant objects and moves to strike this testimony and all statements of fact, because Plaintiff's testimony contradicts the Plaintiff's diary entry.  The Plaintiff was questioned about the discrepancy at her deposition and provided a plausible explanation for the discrepancy with regard to the conflicting information.  As such, it goes to the credibility of the witness and this portion of the Motion to Strike is denied.

10.      The following "Statement of Facts" "Mary Richards" in Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 37).

> 1)      *Jess Byrd, her supervisor, would not give Richards needed tools.  Other leaners got their tools.  This began in April, 2010 when she started for him...Richards made a complaint to H.R. Lydia Kachigian about not getting the tools.  This was done in a civil rights complaint by the Union to Kachigian. Richards complained to Byrd several times.  Richards would ask Byrd for needed tools and he would deny he had any to give her.*  (Doc. 37, pg 2).

Defendant objects and move to strike these statements arguing that they contradict Plaintiff's own testimony because Plaintiff testified she had tools when she started working for Mr. Byrd and that Mr. Byrd did provide the Plaintiff with at least one tool without Plaintiff requesting it.  Defendant further argues that that Plaintiff testified she could not recall when she complained to Ms. Kachigian about not receiving tools and also that she filed a civil rights complaint alleging she was not getting tool and there is no evidence that any such complaint was ever filed.

A review of Plaintiff's deposition testimony indicates the Plaintiff testified that Mr. Byrd failed to provide her tools "multiple times."  (Doc. 37-7, pg 17)  She further testifies that she did not document all the incidents since, "I had a complaint with Lydia."  *Id.*  She furthers testifies

that Jeff Evans filed a civil rights complaint on her behalf pertaining to the tools and that she spoke with Mr. Byrd at "different times" about not receiving tools.  (Doc. 37-7, pgs 17-21). However, later in her testimony she states that she never filed a union grievance.

Plaintiff's testimony with regard to whether Mr. Byrd provided her tool and whether is addressed the tool issue with Mr. Byrd is based upon personal knowledge and is sufficient to support those portions of the statement.  Plaintiff's testimony is also sufficient to support the portion of the statement with regard to her discussions with Ms. Kachigian.  However, it is evident from Plaintiff's testimony and the lack of production of a grievance with regard to the tool issue that any complaint was filed – either by Ms. Richards or her union.  As such, that portion of the statement, "This was done in a civil rights complaint by the Union to Kachigian" is stricken.  The remainder of this portion of the Motion to Strike is denied.

> 2)    *Richards did report the jacket incident on the Hotline*.  (Doc. 37, pg 3).

Defendant objects and moves to strike this statement arguing it misrepresents the uncontroverted evidence in that Plaintiff admits that the first time she reported the incident was through Defendant's Hotline eight months after the fact.  Although the date of the incident is not contained, the date of Ms. Richards' call to the Hotline is stated shortly before the statement that Ms. Richards reported the jacket incident on the Hotline.  Ms. Richards has personal knowledge of when she reported the jacket incident and in what manner she reported it.  As such, this portion of the Motion to Strike is denied.

> 3)    *Byrd singled Richards out to ask her what she learned in blueprint class. Byrd had not asked this of other learners.*  (Doc. 37, pg 2.)

Defendant objects and moves to strike this statement arguing it is based on hearsay.  The first portion of this statement that Byrd asked Ms. Richards "what she learned in blueprint class" is supported by Plaintiff's testimony (Doc. 37-7, pg 37) and is based on Plaintiff's personal

knowledge.  However, at issue is that portion that, "Byrd singled Richards out" and that "Byrd had not asked this of other learners."  Plaintiff deposed Mr. Byrd and he testified that inquiring about learners' classes, "Oh, yeah.  I mean this is something I do to every employee because I got to know what they know when they come into the department to start with.  I don't' want to throw somebody in a situation that they can't handle."  (Doc. 37-9, pg 44).  Plaintiff's testimony with regard to this statement is based upon a statement the of Rudy Reava who Plaintiff testified stated to her, "he's not ever asked anyone else to do that."   (Doc. 37-7, pg 37).  As such, Plaintiff's testimony is clearly based on hearsay evidence and as such, that portion of the statement that, "Byrd singled Richards out" and that "Byrd had not asked this of other learners" is based on hearsay and is stricken.

The Court will now turn to Defendant's Motion for Summary Judgment.   Summary judgment must be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.  It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed.

R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

The first issued raised in Defendant's Motion for Summary Judgment is that Plaintiff's retaliation and sexual harassment claims in Counts I and III are time barred.

"In Illinois, a complainant must file a charge with the EEOC with *300 days* of the alleged discriminatory act and failure to do so renders the charge untimely." *Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 396 (7th Cir. 1999). However, "The continuing violation doctrine allows a complainant to obtain relief for a time-barred act of discrimination by linking it with acts that fall within the statutory limitations period." *Id*, at 396. "Courts will consider three factors in making this determination: (1) whether the acts involve the same subject matter; (2)

the frequency at which they occur; and (3) the degree of performance of the alleged acts of discrimination, 'which should trigger an employee's awareness of and duty to assert his or her rights.'"  *Id,* at 396, *citing Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996).

In this matter, construing the evidence in the light most favorable to the Plaintiff and drawing all reasonable inferences in favor of the Plaintiff, an internal civil rights complaint was filed on January 28, 2011, alleging sexual harassment against Plaintiff's supervisor, Jesse Byrd. (Doc. 33-1 and Doc. 33-3).  Mr. Byrd was one of Plaintiff's supervisors in the Basic Oxygen Furnace Department ("BOF") from April of 2010 until January 9, 2011.  Plaintiff also filed a Hotline complaint on February 12, 2011, alleging further misconduct on the part of Mr. Byrd which occurred June 14, 2010.

On September 29, 2011, Plaintiff was unexcused from work and failed to "report off."[1] U.S. Steel issued her a 5-day suspension subject to discharge on September 30, 2011, and plaintiff received the notice of disciplinary action on October 2, 2011.  (Doc. 33-3).  A hearing was held on October 5, 2011, and Plaintiff's suspension was converted to a discharge effective October 2, 2011.  Plaintiff was notified of the discharge on October 7, 2011, but was permitted to continue her employment pursuant to the Justice and Dignity provision within the Basic Labor Agreement which allowed an employee to remain on the job in the event the Union files a grievance and until there was a final determination on the merits of the case. (Docs.  33-3 and 37-6).

In February of 2012, the discharge was upheld through the grievance process and the Plaintiff states, "It was only in the January and February proceedings of 2012 that I knew the grievance issues were not going to be settled amicable and that a trial before a third party

---

[1] U.S. Steel employees are required to call an 800 number when they are unable to report for their scheduled shift.

arbitrator would be necessary."  The matter proceeded to arbitration during the summer of 2014 and Plaintiff was awarded a 30-day suspension without pay and retained as an employee of U.S. Steel.

As stated above, Courts will consider three factors in making a determination of continuing violation doctrine.  The first is whether the acts involve the same subject matter.  In this matter, there are allegations of sexual harassment that occurred on or before January 9th, 2011. (Doc. 37-8, pg 15).  The incident which occurred in September of 2011, involve Plaintiff's unexcused absence.  As such, these incidents do not involve the same subject matter.

The second factor is the frequency at which the incidents occur.  In response to the question, "Do you believe that you have been subjected to sexual harassment at any time since you left the BOF on January 9th of 2011, whatever the date is you left the BOF?" Plaintiff responded, "No."  As such, there was an incident one and a half years prior to the August 16, 2010, Complaint; the August 16, 2010 Complaint (which covered the period 6/3/2010 – 7/14/2010); and the January 28, 2011 Complaint (which covered April 2010 - January 9th, 2011). Then no incidents for over eight months until Plaintiff's unauthorized absence.

The final factor is the degree of performance of the alleged acts of discrimination, 'which should trigger an employee's awareness of and duty to assert his or her rights.'"  Plaintiff's EEOC Complaint (Doc. 33-2) states, "In February 2012 I was notified that I was being disciplined for not calling off work on September 29, 2011" and her Affidavit states, "It was only in the January and February proceedings of 2012 that I knew the grievance issues were not going to be settled amicable and that a trial before a third party arbitrator would be necessary."  However, it is clear from the documentation provided that the Plaintiff was aware that disciplinary action would be taken with regard to September 29, 2011, unauthorized absence and Plaintiff received

notification of that action no later than October 2, 2011, when she received the Notification of Discipline.

The period in which a claimant may file a charge of discrimination with the EEOC begins to run on the date that the employee is notified of the adverse employment decision and "an employee cannot toll the limitations period by pursuing grievance proceedings." *Williamson v. Indiana University*, 345 F.3d 459, 463 (7th Cir. 2003).

Although Plaintiff's Complaint states that, "Defendant began a series of retaliatory disciplinary actions for filing an internal sexual harassment claim and for her previous EEOC claim," there is no indication that Plaintiff received any disciplinary action until September of 2011, when she failed to report to work and failed to follow the proper procedures for notifying her employer of her absence.

Based on the foregoing, the continuing violation doctrine does not apply in this matter and none of the sexual harassment conduct Plaintiff alleges in her complaint or testified to in her depositions occurred within a *300* day period prior to filing her EEOC claim on August 22, 2012.

If the Court takes the latest permissible date of alleged retaliatory action - notification of the disciplinary action on October 2, 2011 – then Plaintiff had *300* days under 42 U.S.C § 2000e-5(e) to file an action which would have been on or before July 29, 2012.  As such, Counts I and III are time barred.

 With regard to Count II, the Defendant claims that Ms. Richards has failed to state a claim for infliction of emotional distress.   "[T]he Illinois Supreme Court set forth three requirements necessary to demonstrate the intentional infliction of emotional distress:  (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his

conduct will cause severe emotional distress and (3) the conduct must in fact cause severe emotional distress." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). "Whether conduct is extreme and outrageous is judged on an objective standard, based on the facts of the particular case." Id, at 490. "The conduct must go beyond all bounds of decency and be intolerable in a civilized community."  It does not extend to "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id*, at 490, quoting *McGrath v. Fahey*, 127 Ill.2d 724 quoting Restatement (Second) of Torts (1965).

Taking all the incidents in a light most favorable to Ms. Richards, there are alleged incidents which a jury could determine extend to outrageous conduct.

"The tort's second element inquires as to whether the actor either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause such distress." *Id*, at 495.

Neither party addressed Mr. Byrd's intent or whether he was aware that his conduct may have inflicted emotional distress on Ms. Richards at his deposition.  According to Mr. Byrd's testimony, Ms. Richards was "combative" and directed profanity at him.  (Doc. 49).  However, the Court must take the facts in the light most favorable to Ms. Richards and as such, her testimony that she believes Mr. Byrd's actions were intended to intimidate her is sufficient to meet this element at the summary judgment phase.

"The third element of the tort focuses on the severity of the emotional distress.  "The emotional distress must be *severe*.  Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress," these mental conditions alone are not actionable.  The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.  The intensity and the duration of the distress are factors to

be considered in determining its severity."  *Id*, at 495.

Plaintiff testified that she had seen psychiatrist Dr. Jeffrey Chalfant and the last time she had seen him was March of 2014.  She was also seeing counselor Marjorie LaRico and the last time she had seen her was approximately two weeks before seeing Dr. Chalfant.  She further stated that her husband's mother's new husband was a therapist or psychiatrist and that they had several discussions pertaining to, "My whole scenario with U.S. Steel."

With regard to Dr. Jeremy Jewel, Plaintiff testified that she met with Dr. Jewel, but she had not sought treatment from him because, "My understanding is he's just an evaluator or whatever you call it."  She further testified that she saw him to have an assessment for this lawsuit and meet with him for five hours or so.   Other than the above individuals, Plaintiff has not seen any other psychiatric, counselor, or doctor for psychological counseling or treatment. Plaintiff testified that she is claiming depression, stress, and high blood pressure as a result of the allegations in this case.  She furthers states that U.S. Steel referred her to a Dr. Marsha McCabe in relation to this case and she refused to go.

Although there are no details with regard to Plaintiff's treatment, there is some evidence of treatment which is sufficient, at least at the summary judgment phase, to indicate there is evidence of serve emotion stress.  As such, the three elements necessary to demonstrate the intentional infliction of emotional distress have been met.

## C.  Conclusion

For the above reasons, Defendant U.S. Steel's Motion (Doc. 33) for Summary Judgment is **GRANTED** in part and **DENIED** in part.  Counts I and III are **DISMISSED** with prejudice as being time barred.

With regard to the remaining Count II,   28 § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  A district court has broad discretion in deciding whether to decline jurisdiction over state law claims when no original jurisdiction claims remain pending.  *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, No. 11-1268, 2012 WL 499043, *1 (7th Cir. Feb. 16, 2012).  The district court should consider judicial economy, convenience, fairness and comity.  *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[W]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Wright*, 29 F.3d at 1251).  This is true even when the decision is on the eve of trial so long as the district court has not made a "substantial investment" of time in the litigating untried claims.  *RWJ Mgmt.,* 2012 WL 499043 at *1.

For these reasons, the Court declines to exercise jurisdiction over the remaining claim in this case and **DISMISSES** that claim without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).  The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:**  4/9/2015

*s/J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**